CHITWOOD *v.* ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY COMPANY.

Opinion delivered May 20, 1912.

1.  RAILROADS—NEGLIGENCE—PRESUMPTION.—Under Kirby's Digest, section 6773, proof that an injury was done by the running of a train raises a *prima facie* case of negligence. (Page 41.)

2.  SAME—WHEN CONTRIBUTORY NEGLIGENCE FOR JURY—Where, in an action for the negligent killing of a horse by a train in which the defense was contributory negligence, there was evidence that plaintiff was driving the animal, and that he looked and listened for approaching trains, but that the track was obscured by the adjacent depot, and he was prevented from hearing the train by a strong wind blowing from the opposite direction and by the noise of his wagon, the question of whether he was guilty of contributory negligence should have been left to the jury. (Page 41.)

Appeal from Clark Circuit Court; *Jacob M. Carter*, Judge; reversed.

### STATEMENT BY THE COURT.

The plaintiff W. W. Chitwood sued the St. Louis, Iron Mountain & Southern Railway Company for damages alleged to have been sustained by the negligent killing of his horse, which occurred at a public crossing.

W. W. Chitwood, for himself, testified: "The injury to my horse occurred about 6 or 7 o'clock in the morning on the 1st of April, 1911, at a railroad crossing in the town of Curtis. The public road there runs nearly parallel to the railroad and about 150 feet from it, when it turns at a point estimated by the plaintiff at fifty feet from the railroad and runs directly across the railroad. On the morning in question I was driving down this public road in a wagon with Ellis Bourland. We had been trotting, but when we got near the crossing we stopped the horses, and were going in a walk. I was driving."

He was asked to tell how the accident occurred, and answered: "The road I came was about 150 feet from the track. Between me and the railroad there were two seed houses and several piles of lumber, and after you passed them the depot is on that side. I was going the same way the train was going, and when I turned to go across a little tree was standing between me and the train. As I went to go across, I saw the train coming, and I saw that I could not get across. I hurled the horses around the way the train was going. The train caught one of the horses near the shoulder and killed him. The train was running about fifty miles an hour and the wind was blowing in the opposite direction from the way the train was going, and that would prevent me from hearing the noise of the train to some extent. The morning was damp and cloudy. The employees of the railroad did not ring the bell or blow the whistle for the crossing. Before we got to the main track, we had to cross a side track, and I was about ten or twelve feet from the main track when I first saw the train. The horses were almost ready to step on the track, and as above stated I at once hurled them around. If they had blown the whistle or rung the bell, I would have heard it a good ways before I reached the crossing. I could have heard the whistle anywhere from a quarter to a half a mile from there. I did hear one from another train about ten minutes afterwards while driving along. I could have heard the bell ring as much as 200 yards away. The depot was 100 yards distant from the crossing, and was situated about ten feet from the main track. I could not see the train any sooner on account of the depot shutting out its view. It was an average-sized depot, and about twenty-five feet in width. Q. Did you look? A. I could not remember whether I looked or not. I do not ever cross without looking for a train, but to say whether I looked when behind the depot—I could not say that. * * * I would say that for over a quarter of a mile the depot would hide the train from me. If we had been standing all of the time, there is a prospect that we would have seen it, but when we passed the store where we could see the train, it was not in sight, and then when we could have seen it we were behind the depot. I did not stop to listen."

Ellis Bourland testified: "That he was riding with the

plaintiff on the occasion in question, and that they had a scraper in the wagon which made a good deal of noise while the horses were trotting. He says that the horses kept in a trot until they struck the sidetrack and until about ten feet from the main track. He says that he did not look for the train.

J. A. Mohnkern testified: "I remember the day the plaintiff's horse was killed. The bell was not rung nor was the whistle sounded for the crossing. I remember that fact because I was making up the mail for the train that followed about forty minutes behind the one in question, and was listening for the train to whistle and did not hear it do so."

On cross examination he could not say whether the bell was ringing or not. "From the point I would naturally look for a train he would have been about fifty feet from the track, and from that point the depot would obscure the track I guess about 200 or 300 yards beyond the depot. Of course, if he had looked where the road comes up here before he turned, he could have seen the train possibly 150 yards from the depot, but up here the depot would hide the track two or three hundred yards. Q. Was there any point after that time where he could have seen the train? A. No, sir; not until he went by the depot."

Andy McAlester testified: "I am a farmer, and live a half mile south of the Curtis station. I am familiar with the situation of the railroad track and public road at Curtis. There is a sidetrack between the public road and the main track. It is fifty or fifty-five feet from the main track to the west side of the sidetrack, and is about sixty-five or seventy feet from where the public road starts to go across the railroad to the center of the main track. At the point about fifty or fifty-five feet from the railroad track, the view of the train would be obstructed by the depot for a certain distance, according to the length of the train, but after you get closer to the main track you can see down the track."

### CROSS EXAMINATION.

"As one approached the track, his view would close up behind the depot, and open up in front of it. It is thirteen rails from the crossing to the depot; that means 130 yards. It is level from the sidetrack to the main track. After he had

crossed the sidetrack, if he had stopped in thirty feet of the main line, he could have seen down the railroad a good ways— he could have seen the switch stand."

*John H. Crawford,* for appellant.

1. To entitle appellant to a reversal, it is enough if the evidence when considered in the light most favorable to his contention, and given its strongest probative force, is sufficient to sustain a verdict in his favor. 91 Ark. 337, 340; 96 Ark. 243; 73 Ark. 561; 89 Ark. 368; 89 Ark. 582; 76 Ark. 522.

Wherever there is any evidence, however slight, tending to establish the issue, it is a case for the jury under proper instructions. 63 Ark. 94; 66 Ark. 363; 76 Ark. 520. See also 71 Ark. 445; art. 7, § § 7 and 23, Const.

2. On the question whether appellant was guilty of such contributory negligence as to preclude recovery, the evidence is not such as to authorize the court to declare as a matter of law that he was guilty of such negligence. 100 Ark. 53; 76 Ark. 232; 62 Ark. 159; 78 Ark. 60; *Id.* 361; 96 Ark. 638; 97 Ark. 405; 90 Ark. 19; 88 Ark. 231.

*E. B. Kinsworthy, W. V. Tompkins* and *R. E. Wiley,* for appellee.

The court was authorized to direct a verdict for the defendant. The test in such cases is: "Where the undisputed evidence shows that the injured person's opportunity was such that he could not have failed to have seen or heard the approaching train in time to have avoided the injury if he had used due and ordinary care in looking and listening, then the law declares him guilty of negligence, precluding him from recovery." 100 Ark. 53.

HART, J., (after stating the facts). Under section 6773 of Kirby's Digest, placing responsibility upon railroads where injury is done to persons or property by the running of trains, a *prima facie* case of negligence is made out against the company operating the train by proof of the injury. *Kansas City So. Ry. Co.* v. *Davis,* 83 Ark. 217.

The only remaining question is whether or not the plaintiff was guilty of contributory negligence. The court directed a verdict for the defendant, and, in testing the correctness of its action in this respect, the evidence must be viewed in

its most favorable light to the plaintiff. It is insisted by counsel for the defendant that the plaintiff did not look and listen for the train which injured his horse. In making this contention, they rely upon the answers to the following questions which were propounded to the plaintiff.

"Q. Did you stop to listen? A. No, sir. Q. How close were you to the track when you did look? A. Ten or twelve feet; the horses were almost ready to step on the track."

When this extract from the plaintiff's testimony is considered with reference to his other testimony and to the other evidence introduced in the case, we do not think it susceptible of the meaning contended for by the defendant. He had already testified that, after he passed the store where he could have seen a train had it been there, there was no train in sight. He said that after that the depot obscured his view of the train so he could not have seen it. It appears from his testimony that he was in possession of all his faculties, and was listening for the trainmen to give the customary signals for the crossing, and did not hear any.

Again he says, he never went over a railroad without looking for a train, although he could not remember all the specific points at which he looked for the train on the morning in question. The depot was 100 or 130 yards distant from the crossing. The plaintiff says that the track was obscured from view beyond the depot. Now, this fact and the further fact that a strong wind was blowing from the opposite direction to that in which the train was going, and the fact that the wagon in going along made a certain amount of noise, were all matters for the jury to consider in determining whether or not the plaintiff used ordinary care, or was guilty of contributory negligence.

The testimony, when considered in its strongest light against the defendant, does not establish the fact that he did not look and listen, but goes to the extent of showing that he did not stop his wagon to look and listen. His failure to stop under the circumstances was not sufficient for the court to tell the jury that as a matter of law the plaintiff did not use ordinary care and was guilty of contributory negligence. It will be remembered that the evidence shows that the trainmen did not give the customary signal or warning that the train was approaching the crossing. The plaintiff had a right

to assume that this duty would be performed and the customary signals given. His testimony shows that he was in possession of all his faculties, and was listening for the bell to be rung or the whistle to be blown for the crossing. This was not done. The jury might have believed, under all the facts and circumstances adduced in evidence, that, although the plaintiff should 'have exercised greater vigilance because the track beyond the depot was obscured from his view, and because a strong wind was blowing in the opposite direction to which the train was going, yet, if the statutory signals of warning for the crossing had been given, the plaintiff would have been as likely to hear them without stopping as otherwise; hence the question of contributory negligence was one for the jury, and the court erred in directing a verdict for the defendant. *Railway Co.* v. *Amos,* 54 Ark. 159; *St. Louis, I. M. & S. Ry. Co.* v. *Stacks,* 97 Ark. 405.

Because the court erred in directing a verdict for the defendant, the cause will be reversed and remanded for a new trial.